UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RICHARD SANDERSON, ET AL., | § | CIVIL ACTION NO. 09-7336 |
| *Plaintiffs* | § § § | |
| v. | § § | Section: N |
| SHELL OIL COMPANY, ET AL., | § § § | |
| *Defendants* | § | Magistrate: 4 |

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF JOHN SPENCER

Defendant, Shell Oil Company, individually and as successor in interest to Shell Chemical Corporation, erroneously named "Shell Chemical LP" (hereinafter "Shell") submits this Memorandum in Opposition to Plaintiffs' "Motion to Exclude Testimony of Defendants' Putative Certified Industrial Hygienist John Spencer" (Rec. Doc. 37) (hereafter "Motion"). In addition to this Memorandum, Shell submits the Declaration and Report of John Spencer ("Mr. Spencer"), which are attached hereto as Exhibits A and A-1, respectively.

I.   **Introduction**

A careful review of Plaintiffs' Motion, Mr. Spencer's Report, and Mr. Spencer's Declaration reveals the hollow rhetoric and outright misstatements which serve as the basis for Plaintiffs' Motion. As detailed below, Mr. Spencer is qualified as an expert in the field of industrial hygiene and occupational safety, and he rigorously adhered to the

well accepted methodology and guidelines in the field of industrial hygiene specialists in rendering his opinions. Not only do Plaintiffs misrepresent Mr. Spencer's methodology and conclusions, they also at times make outright false statements in an attempt to disparage his qualifications. Such tactics are examples of Plaintiffs' empty and hyperbolic rhetoric that is contrary to the undisputed facts and lacks substantiating evidence. Mr. Spencer properly substantiates each and every one of his opinions with reliable and relevant scientific evidence, as well as facts supported by evidence.

In addition to this Motion, Plaintiffs have filed separate motions seeking to exclude the opinions of four other of Shell's experts on the basis of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("*Daubert*"). A persistent pattern and a common theme emerge in these *Daubert* motions, which can be summed up as follows: Misstate the facts in the record; inaccurately state the opinions of Shell's expert; misrepresent the methodology actually used by Shell's expert; and simply ignore the reliable and relevant scientific evidence relied upon by Shell's expert if that evidence does not support Plaintiffs' position. Such tactics do not amount to **evidence**, and they certainly do not serve as a proper basis for challenging an expert's opinion under *Daubert*. Once the accurate facts are established, the reliable and relevant scientific evidence is properly considered, and the hyperbolic rhetoric is put aside, it becomes clear that Plaintiffs' Motion is devoid of any merit.

II. <u>Mr. Spencer Is Exceptionally Qualified As An Expert in the Field of Industrial Hygiene</u>

Plaintiffs make every attempt to chip away at Mr. Spencer's qualifications, but those qualifications speak for themselves. The following is a highlight of Mr. Spencer's

education, training, and experience, as set forth by Mr. Spencer in his Declaration:

> Currently, I am the President of Environmental Profiles, Inc. in Baltimore, Maryland. Formerly, I was with the **National Institute for occupational Safety and Health (NIOSH)** and led a group of industrial hygienists conducting research for the National Occupational Exposure Survey. As an industrial hygienist for the **United States Coast Guard**, I conducted hundreds of exposure assessments inclusive of a wide range of products, including numerous benzene-containing materials. My responsibilities also included the management of the occupational medical monitoring program for the 5th Coast Guard District. **I was President of the Chesapeake Section of the America Industrial Hygiene Association (AIHA)** and was a member of the national AIHA Product Health and Safety Committee .and the Emergency Response Planning Committee. I have also authored the Health and Safety Audits Manual, published by Government Institutes, and the AIH Hazard Communication Guide, published by the AIHA. **The American Board of Industrial Hygiene certifies me as an industrial hygienist and the Board of the Certified Safety Professionals certifies me as a safety professional.**

(Exhibit A, para. 1) (emphasis provided).

In an attempt to discredit Mr. Spencer's eminent qualifications, Plaintiffs assert that he has never qualified as an expert in biology, chemistry, or chemical engineering. (Rec. Doc. 37-2, p. 8). However, Plaintiffs' assertion is **irrelevant** to Mr. Spencer's qualifications as an expert in the field of **industrial hygiene**. Mr. Spencer explains in his Declaration that chemistry is a significant part of assessing exposure, and that chemistry was a significant component of his training and academic coursework. But, Mr. Spencer makes the important distinction – which Plaintiffs ignore – that a "chemist" is not qualified to render expert opinions regarding industrial hygiene unless he or she has had additional, specialized training in industrial hygiene. This distinction reveals the emptiness of Plaintiffs' claim. Mr. Spencer addresses Plaintiffs' meaningless assertion in his Declaration:

> [Plaintiffs' assertion] is irrelevant. In my July 1, 2009 testimony in another case (*Bishop v. Shell*), in response to the questions whether I consider myself to be an expert in biology or chemistry, I stated I have never been offered for expert

> testimony as a chemist or a biologist but that chemistry was a significant component of my training and academic coursework and is a significant part of the exposure assessment process. In this instant case, I am offered for expert testimony as a certified industrial hygienist, an area in which I am an expert. The definition of industrial hygiene is, "that science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stresses arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community." (Fundamentals of Industrial Hygiene, Third Ed. Page 3). **A biologist, chemist or chemical engineer would not be [an] appropriate person to offer as an industrial hygiene expert unless they had undergone the additional training an acquired the extensive experience necessary to properly evaluate an individual's exposures to chemical, physical, and biological agents.** I do have a Bachelor of Sciences degree in Biological Sciences.

(Exhibit A, para. 23) (emphasis provided).

Plaintiffs also assert that Mr. Spencer is not qualified because he does not hold a master's or doctoral degree. (Rec. Doc. 37-2, p. 8). What Plaintiffs ignore is that such degrees are not a requisite for qualifying as an expert in the field of industrial hygiene:

> A Master's degree or Ph.D. are not requisite for offering an expert opinion as I and other experts have illustrated on multiple occasions. I have extensive experience in the field of industrial hygiene. . . **The education, training, certifications, and experiences throughout my 33+-year career as an industrial hygienist qualify me to address Mr. Sanderson's potential exposures to benzene in this case.**

(Exhibit A, para. 27) (emphasis provided). Plaintiffs' assertion is a red herring and ignores Mr. Spencer's vast experience and thorough training in the field of industrial hygiene. Mr. Spencer clearly qualifies as an expert in that field.

### A. The Cases Cited By Plaintiffs Provide No Support for Their Position That Mr. Spencer Is Not Qualified As An Expert In Industrial Hygiene

Without providing any substantiating evidence, Plaintiffs sweepingly claim that Mr. Spencer was excluded from offering expert testimony regarding the plaintiff's exposure assessment in a case entitled *Lane v. Gasket Holdings, Inc.* (Rec. Doc. 37-2, p.

9). In response, Mr. Spencer states he has **never even worked on a case by that name** and, therefore, the claim is a "total fabrication". (Exhibit A, para. 37).

Nor does *Alder v. Bayer* support Plaintiffs' claim that Mr. Spencer is not qualified. (*See* Rec. Doc. 37-2, p. 9). The mere fact that the court placed greater weight on the conclusions of the opposing expert in that case is certainly not a basis for disqualifying an expert. Indeed, the important and undisputed fact is that Mr. Spencer qualified as an expert in industrial hygiene in the case.

### III. Plaintiffs' Attacks on Mr. Spencer's Report Are Based on Misrepresentations and They Ignore Mr. Spencer's Methodology

Plaintiffs assert a plethora of challenges to Mr. Spencer's methodology – not one of which has merit. Each challenge, as well as Plaintiffs' misstatements and misrepresentations of the evidence, are addressed in detail below.

#### A. Plaintiffs Misstate the Evidence Regarding the Benzene Content of Gasoline to Which Mr. Sanderson Was Exposed

Plaintiffs sweepingly claim that Mr. Sanderson was exposed to benzene and benzene-containing products, including gasoline (5% benzene content), during the period from 1961 to 1978. (*See* Rec. Doc. 37-2, p. 2). However, Mr. Spencer points out that Plaintiffs' statement on this issue is contradicted by their own expert, Mark Nicas ("Mr. Nicas"):

> Dr. Nicas. . .cited an unknown study of seven Shell gasoline stations across six states where the benzene content ranged from 0.41% to 1.74% benzene in the gasoline. Dr. Nicas concluded from this study that the average benzene content in the gasoline was 1% vol/vol and **not the 5% stated by the Plaintiffs' attorney.**

(Exhibit A, para. 4) (emphasis provided). Therefore, even Plaintiffs' own expert opines that the average benzene content in the gasoline to which Mr. Sanderson was allegedly exposed was only 1% vol/vol and not 5% as alleged in Plaintiffs' Motion.

### B. Contrary to Plaintiffs' Assertion, Mr. Spencer *Did* Calculate Benzene Exposure for Mr. Sanderson's Work As a Mechanic and Pumping Gasoline

A primary basis for Plaintiffs' Motion is that Mr. Spencer "ignores the benzene levels that Mr. Sanderson was exposed to while performing mechanic [work] and pumping gasoline". (Rec. Doc. 37-2, p. 7). However, a review of Mr. Spencer's Report, alone, directly refutes Plaintiffs' assertion and reveals the complete lack of substantiation for such claims.

As Mr. Spencer points out in his Declaration, it was Plaintiffs' industrial hygiene expert who did not identify or calculate any benzene exposure for Mr. Sanderson peforming mechanic's work. Though Mr. Nicas did not, **Mr. Spencer did**:

> **Dr. Nicas**, the plaintiffs' industrial hygiene expert, **did not** identify or calculate any benzene exposure for Mr. Sanderson performing mechanic's work. **I did, by citing the Norliner and Ramnas study that addressed mechanics' exposures to benzene from gasoline during their mechanic work. By citing the data in this report, I addressed the plaintiff's potential exposure as a mechanic from the Shell product at issue in this case: the gasoline.**

(Exhibit A, para. 8) (emphasis provided). As they have typically done throughout this, and other motions challenging Shell's experts, Plaintiffs choose to ignore the undisputed facts and evidence and instead create their own "rendition" of the facts and evidence.

Contrary to Plaintiffs' representation, Mr. Spencer specifically addressed Mr. Sanderson's exposure from pumping gasoline in his report:

> My opinion is very clear and concise regarding Mr. Sanderson's exposure to benzene from the pumping of Shell gasoline, the only Shell product in question. That is, Mr. Sanderson's exposure to benzene on a daily basis would have been less than 0.06 ppm from the pumping of gasoline, which is significantly lower that the current OSHA 8-hour TWA PEL for benzene of 1 ppm and the STEL of 5 ppm. Regarding the contrived and alleged discounting of peer-reviewed literature for exposure of gas station attendants, I referenced additional studies not considered by Dr. Nicas. . .

(Exhibit A, para. 10). Mr. Spencer devotes more than two pages of his Report to assessing Mr. Sanderson's benzene exposure from pumping gasoline, and in fact, used the daily average exposure rate assumed by Mr. Nicas, as well as the McDermott & Vas (1979) study relied upon by Mr. Nicas. (Exhibit A, pp. 5-7). Plaintiffs' claim on this issue is meritless.

Furthermore, contrary to Plaintiffs' assertion, Mr. Spencer **did** address Mr. Sanderson's potential exposure as a mechanic, specifically to Shell gasoline:

> Additionally, the Norlinder and Ramnas (1987) study that I cited in my report addresses mechanics' exposures to benzene from gasoline during their workplace activities. **By citing the data in this report, I did address the plaintiff's potential exposure as a mechanic from the Shell product at issue in this case: the gasoline.**

(Exhibit A, para. 19) (emphasis provided). Plaintiffs' claim on this issue is equally meritless.

    C.    **Mr. Spencer Bases His Exposure Estimates on Scientific Studies Involving Work Similar To The Specific Work Performed by Mr. Sanderson**

Plaintiffs sweepingly assert that Mr. Spencer "has engaged in a process of denial and "has no methodology in this case other than 'I say it is.'" (Rec. Doc. 37-2, p. 4). Again, Plaintiffs make bold assertions which are flatly contradicted by the evidence,

specifically Mr. Spencer's Report. (*See* Exhibit A-1). In his Report, Mr. Spencer identifies all of the scientific literature upon which he relies, and explains why each source is relevant to Mr. Sanderson's alleged exposure. *Id.*, pp. 5-6. In his Declaration, Mr. Spencer elaborates on the methodology he used, and the evidence he relied on:

> I relied upon my education, training, research, and experience in the field of industrial hygiene and occupational safety. I further based my opinions in this case on several peer-reviewed literature sources. I also relied upon the following basic tools in order to conduct an exposure assessment of the personal occupation exposures such as Mr. Sanderson's including 1) a characterization of the workplace environment; 2) a characterization of the job and tasks (including frequency and duration of exposures); 3) a characterization of products; 4) a characterization of relevant safety and health regulations and the associated exposure limits; 5) an appropriate association of tasks, environment, job descriptions and chemical agents with the individual exposures being evaluated; and 6) use of accepted air sampling and analytical techniques for occupational exposure to benzene.
>
> \* \* \*
>
> I based my opinions in this case on several peer-reviewed literature sources, two of which (Hartle, 1993 and McDermott & Vos, 1979) were also relied upon by the Plaintiff's industrial hygiene expert, Dr. Mark Nicas. I provided no "unsupported speculation" as alleged by the plaintiff, but relied on exposure estimates presented in published, peer-reviewed literature for workers conducting the same or similar work tasks that the Plaintiff allegedly performed in this case. This is in accordance with standard industrial hygiene practices, as presented in various publications and as part of standard industrial hygiene training. (Mulhausen, John R. and Joseph Damiano. A Strategy for Assessing and Managing Occupational. Exposures, American Industrial Hygiene Association, Fairfax, VA, Third Ed. 2006).

(Exhibit A, paras. 2 and 6). Mr. Spencer specifically identified the relevant peer-reviewed literature upon which he relied, which includes **two articles which were also relied upon by Mr. Nicas.** Taken at face value, some of Plaintiffs' criticisms are equally applicable to their own expert.

      **D.**    **Mr. Spencer's Opinions Regarding Practices for Parts Washing Are Consistent With His Research and the Published Literature**

Plaintiffs complain that Mr. Spencer's opinions related to Mr. Sanderson's use of benzene in a parts washer are inconsistent with the evidence. In fact, Mr. Spencer's opinions are completely consistent with the evidence. As detailed in his report, Mr. Spencer conducted personal interviews with three Shell employees: one who was a sales representative responsible for Shell chemical sales, including benzene, from 1967 to 1980 in the geographical area where Mr. Sanderson worked; one who was a senior technical representative from 1969 to 1975 responsible for handling chemical sales in Louisiana; and one who was a retail manager in the New Orleans area from 1974 to 1980. (Exhibit A-1, pp. 8-9). All three of these gentlemen confirmed that while Shell sold only benzene in bulk quantities of truck tank to barge load quantities to chemical companies in the 1960s and 1970s, and that no time during the relevant period did Shell sell 5-gallon containers of benzene as alleged by Mr. Sanderson. *Id.* Therefore, Mr. Spencer concluded that if Mr. Sanderson used "benzene" for the tasks he alleged, it was not a Shell product:

> In regards to dermal exposure and "benzene fumes from the parts-washer," **I did not calculate exposure from the parts washer activities due to the fact that the alleged benzene product that Mr. Sanderson used was not a Shell product based on my investigations,** including interviews with Ken Hyde and Frank Veranth, personnel responsible for Shell chemical sales including benzene from 1967 to 1980 in the relevant geographical location, and interviews with Herb Stathes, former district manager for Shell retail service stations in New Orleans...
>
> \* \* \*
>
> In fact, **my report summarizes Mr. Sanderson's testimony regarding the use of the parts washer and use of benzene in the parts washer.** *See* Spencer Report at 7-8. **My conclusion is that if Mr. Sanderson did indeed use benzene in his parts washer, it was not a Shell product.**

(Exhibit A, paras. 9 and 13) (emphasis provided).

Mr. Spencer's research and investigation led him to conclude that Mr. Sanderson

did not use Shell benzene as a parts washer. Plaintiffs may disagree with Mr. Spencer's research and investigation, as they surely do, but that does not mean that his methodology is flawed. On the contrary, Plaintiffs' methodology is "believe what we are telling you" and "how dare you challenge our beliefs", hardly the hallmark of *Daubert*-worthy expert opinions.

### E. There Was No Need For Mr. Spencer To Provide An Additional Cumulative Dose Calculation

Plaintiffs complain that Mr. Spencer did not calculate a parts per million exposure assessment for Mr. Sanderson. (Rec. Doc. 37-2, p. 9). However, Plaintiffs ignore the fact that there was no need to do so, for two reasons, as Mr. Spencer explains in his Report and Declaration:

> Based on the information I gathered and reviewed in this case, the alleged benzene product used in the parts washer by Mr. Sanderson was not a Shell product. Therefore, I did not calculate his benzene exposure to that un-named manufacturer's product. I did, however, comment on the calculations completed by Mr. Nicas regarding the inhalation of benzene from the pumping of gasoline and **concluded that Mr. Nicas' cumulative exposure to benzene from pumping Shell gasoline, 0.966 ppm-years is considerably below the OSHA derived lifetime limit of 45 ppm-years.** I concluded that this level of exposure would not constitute a significant risk of exposure based on a comparison with the existing occupational health standards and guidelines. There was no need to provide an additional cumulative dose calculation when the plaintiff's expert calculation supported an acceptable risk from exposure to benzene from gasoline.

(Exhibit A, para. 18) (emphasis provided). (*See also*, Exhibit A-1, pp. 8-9, 10).

There are valid and scientific reasons Mr. Spencer did not calculate a parts per million exposure assessment in this case. Plaintiffs' claim that it was error for him not to do so is both factually and scientifically unsound.

### F. In Accordance With OSHA, ACGIH, and NIOSH Standards, Mr.

**Spencer Did Not Perform A Dermal Exposure Assessment**

Without specifying the underlying reasons, Plaintiffs sweepingly assert that Mr. Spencer has a "fundamental lack of familiarity with the peer-reviewed benzene dermal exposure literature." (Rec. Doc. 37-2, p. 4). In his Declaration, Mr. Spencer explains that he is very familiar with the benzene dermal dose assessment literature and has, in fact, presented on the subject at an American Industrial Hygiene Conference:

> I am very familiar with the benzene dermal dose assessment literature and thus can accurately comment on the fact **that various studies have been conducted using different methodologies.** In fact I have testified to this very specific issue in a hearing in New Mexico (Andrews v. Atlantic Richfield) in which the Plaintiff's expert in this case [Mr. Nicas] was excluded from presenting his dermal dose testimony. I have also presented on the scientific limitations of dermal dose quantification at a recent American Industrial Hygiene Conference (2009).

(Exhibit A, para. 11) (emphasis provided).

In the present case, Mr. Spencer did not conduct a dermal exposure assessment, and he explained the two fundamental reasons why he did not do so. First, there is no evidence that Mr. Sanderson sustained dermal exposure as a result of his work related to Shell gasoline. Indeed, Mr. Nicas did not identify Shell gasoline as presenting a dermal route of exposure for Mr. Sanderson. (See Report prepared by Mr. Nicas, attached as Exhibit B). Therefore, there was no reason to assess dermal exposure.[1] (*See* Exhibit A, para. 11).

Second, even if Mr. Sanderson had sustained any dermal exposures relative to any Shell product (which is denied), Mr. Spencer explained why it is not scientifically appropriate to conduct a separate assessment for dermal exposures. He also explained

---

[1] As discussed, *supra*, there is no evidence that the benzene Mr. Sanderson allegedly used in the parts washer was a Shell product.

why it was scientifically inappropriate for Mr. Nicas to use the dermal flux model in his exposure assessment:

> However, the **dermal flux model** used by Dr. Mr. Nicas **has not been standardized nor validated for conducting occupational exposure assessments relevant to this case.** In addition, **the dermal exposures were accounted for in the development of the OSHA benzene standard.** There is no dermal exposure limit for benzene and OSHA, American Conference of Governmental Industrial Hygienists (ACGIH), and the National Institute for Occupational Safety and Health, (NIOSH), neither require nor recommend quantifying dermal exposures. **There is currently no accepted OSHA, NIOSH or ACGIH (the occupational health standard setting organizations) method for quantifying dermal exposures.**

(Exhibit A, para. 21) (emphasis provided).

On these bases, Mr. Spencer appropriately did not prepare a dermal exposure calculation.

### 1. Plaintiffs Misrepresent Mr. Spencer's Opinion Regarding Assessment of Dermal Exposure

Additionally, Plaintiffs misrepresent Mr. Spencer's testimony on the issue of dermal exposure calculation, implying that he endorses the concept. (*See* Rec. Doc. 37-2, p. 9).[2] That is absolutely not the case. Plaintiffs have cherry-picked particular statements from Mr. Spencer's deposition, placed their "spin" on the statements, and ignored all remaining statements in Mr. Spencer's deposition on the issue. In his Declaration, Mr. Spencer corrects this misrepresentation of his testimony:

> This is a misrepresentation and an incomplete extraction of my testimony. **I continued on to say that the dermal studies are all done differently and, "there is no standardized and accepted and validated method for doing it."** [citing his July 01, 2009 deposition at 40].
>
> * * *

---

[2] Specifically, Plaintiffs state that Mr. Spencer has performed a benzene dermal calculation in another case, and that he has testified he could plug numbers in a model to perform dermal calculation.

In that same deposition, I testified that the routes of exposure to benzene are typically via inhalation and potentially dermal uptake. *Id.* at 38 and 39. I mentioned ingestion as an improbable, but possible route of exposure. *Id.* **I also stated, "if we are concerned about dermal dose in addition to inhalation dose, we collect biological samples, blood or urine samples and have that evaluated, and that's why we do not use a dermal calculation to determine the significance of exposure."** *Id.* at 23. My opinions were accurately stated in my report in this case, as follows:

- ❖ "There is no dermal exposure limit. OSHA, ACGIH, and NIOSH neither require nor recommend quantifying dermal exposures."
- ❖ "The tools to quantify dermal exposure to organic solvents such as benzene and have not been standardized nor validated..."
- ❖ "[D]ermal exposures were accounted for in the development of the OSHA benzene standard."

(Exhibit A, paras. 30-31) (emphasis provided). (*See also,* excerpts of deposition of John Spencer, pp. 23, 38-40, attached as Exhibit C).

Plaintiffs misrepresent and misinterpret Mr. Spencer's opinions regarding dermal exposure calculation, and their position is devoid of merit.

### G. Mr. Spencer is Qualified To Render Opinions Regarding The Duties Of Manufacturers Related to Safety

Plaintiffs assert that Mr. Spencer's opinions regarding the duties of manufacturers related to safety are improper because they are allegedly beyond the scope of his expertise. (Rec. Doc. 37-2, p. 6). However, Mr. Spencer explained in detail that his experience and training in field of industrial hygiene includes and, indeed, requires knowledge of parties' regulatory responsibilities to convey safety information:

> Regarding the scope of expertise, I am a Certified Safety Professional and Certified Industrial Hygienist. My experience in providing safety training, safety consulting, the development of safety and health programs, and hazard determination, require a thorough understanding of various parties' regulatory responsibilities to convey hazard information...
>
> **These responsibilities are outlined in various professional guidance documents and Federal standards, including the OSHA Hazard Communication Standard,** which clearly states that the duty to provide safety

and health training is the responsibility of the employer and not the product manufacturer (1910.1200 (h)). Product manufacturers are not required, nor are they able to train the end users, such as the Plaintiff, Mr. Sanderson. **The applicability of these regulations are spelled out within the standard and are not beyond my expertise but part of the basic tenets used in the safety and health field.** In fact, I served on the national committee of the AIHA Product Health & Safety. As a member of this committee, I put forth technical presentations and roundtables focused on product risk assessment. Our committee was also responsible for peer reviewing the American National Standards Institute's (ANSI) guidelines for preparing material safety data sheets (MSDSs) and product warning labels.

(Exhibit A, paras. 15-16) (emphasis provided). Plaintiffs' assertion lacks any merit.

### H. Plaintiffs Further Misrepresent Mr. Spencer's Opinions and Testimony

In an attempt to disparage Mr. Spencer's expertise, Plaintiffs erroneously assert that Mr. Spencer lacks sufficient knowledge to distinguish between "benzine" and "benzene, and allege that Mr. Spencer states that benzine is not the same as benzene because it is a hydrocarbon within the C5-C7 range. (Rec. Doc. 37-2, p. 8). As Mr. Spencer explains in his Declaration, Plaintiffs' purported scientific explanation of the chemical composition of benzine and benzene is scientifically incorrect:[3]

> [Plaintiffs] stated, "[Mr. Spencer] claims that "benzene" is not the same as benzene because it is a hydrocarbon within the C5-C7 range.". . .
>
> **This is a misstatement and represents a clear lack of technical understanding on the part of the plaintiff's attorney.** In my report I stated, "A chemical mixture called "benzine," "benzin," "petroleum benzin," or "petroleum ether" is a petroleum distillate consisting of aliphatic hydrocarbons mostly in the C5-C7 series." The plaintiff's attorney is not qualified to make this statement since he does not understand the difference between an aliphatic hydrocarbon and an aromatic hydrocarbon. Benzene is an aromatic hydrocarbon; whereas benzine is a mixture of aliphatic hydrocarbons. According to the Columbia Encyclopedia, benzine is a colorless, highly flammable liquid used as a cleaning agent because it is a good solvent for organic substances such as fats, oils, and resins. It states: Benzine is a mixture of hydrocarbons, chiefly alkanes such as pentane (C5) and hexane (C6). Alkanes are aliphatic hydrocarbons. *See* Hawley's Condensed

---

[3] As an aside, Plaintiffs fail to cite any reference for their purported scientific explanation.

Chemical dictionary, 11th Edition, at 34. NIOSH also notes the confusion between the use of the terms "benzene" and "benzine" in the 1974 or 1976 Criteria Document for Benzene.

(Exhibit A, paras. 24-25) (emphasis provided). Plaintiffs' attempt to discredit Mr. Spencer's knowledge and expertise is devoid of any merit.

Lastly, Plaintiffs have carefully selected statements from Mr. Spencer's deposition testimony, ignored his remaining testimony, and twisted and misconstrued those select statements to fit their biased and self-serving position. Specifically, Plaintiffs state that Mr. Spencer "routinely testifies **solely** for the defendants" because that is who he looks for". (Rec. Doc. 37-2, p. 10) (emphasis provided). In his Declaration, Mr. Spencer clarifies his deposition testimony and sets forth the accurate facts regarding his work as an expert in the field of industrial hygiene:

> The question was asked in my July 01, 2009 deposition in the *Bishop v. Shell* matter whether I routinely testify solely on behalf of defendants because I mean that's who I am able to get to support scientifically and, yes I men that's what I look for. [July 01, 2009 Deposition at 46.] **I stated that "routinely" is correct but not "solely."** *Id.* I also stated that I had worked maybe five to ten times directly for the plaintiff. *Id.* I further clarified the statement, "I am able to support scientifically" with the explanation, "that there is sufficient information, scientific information to support my position." *Id.* Then counsel asked about the statement, "and I mean that's **what** I look for." *Id.* To expand on this, I responded: **"I review literature. I review studies, published and unpublished studies, other government documents that are available, and draw upon my own experience which has been involved, extensive experience in monitoring exposures in a variety of different work places."** *Id.* at 47. **I look for scientifically defensible cases, and not defendants in particular, as the Plaintiff's attorney's misstatement of "who" instead of "what" would suggest.**

(Exhibit A, para. 33) (emphasis provided in part). As do Plaintiffs' other assertions, this assertion rings hollow.

IV. <u>Conclusion</u>

2038498-1

15

Mr. Spencer's exceptional qualifications in the field of industrial hygiene, based upon his education, training, and more than thirty years of experience, cannot be genuinely disputed. Nor can the substance of Mr. Spencer's Report and Declaration be genuinely disputed, despite the plethora of misstatements and misrepresentations set forth by Plaintiffs in their Motion. Mr. Spencer's opinions are overwhelmingly substantiated by reliable and relevant scientific evidence, as well as the facts which are supported by evidence. Plaintiffs' "arguments" do not change the evidence. For all of the reasons set forth herein, Shell respectfully requests that Plaintiffs' Motion be denied in all respects.

Respectfully submitted:

/s/ Allison N. Benoit
Gary A. Bezet (#3036)
Barrye Panepinto Miyagi (#21794)
Robert E. Dille (#23037)
Allison N. Benoit (#29087)
KEAN MILLER HAWTHORNE D'ARMOND
MCCOWAN & JARMAN LLP
Eighteenth Floor
One American Place
301 Main Street
Baton Rouge, Louisiana 70825
Telephone: (225) 387-0999
Facsimile: (225) 388-9133
Allison.Benoit@keanmiller.com


/s/ Marty Thompson
STAN PERRY
Texas Bar No. 15799920
MARTY E. THOMPSON
Texas Bar No. 24037598
HAYNES AND BOONE, LLP
1221 McKinney, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2039
Facsimile: (713) 236-5455

*Attorneys for Shell Oil Company*

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all known counsel of record.

/s/ Allison N. Benoit