UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RICHARD SANDERSON, ET AL. | § | CIVIL ACTION NO. 09-7336 |
| Plaintiffs | § | |
| | § | SECTION: "N" |
| VS. | § | |
| | § | JUDGE: ENGLEHARDT |
| SHELL OIL COMPANY, ET AL. | § | |
| Defendants | § | MAGISTRATE: ROBY |

**Supplemental Memorandum in Support of Motion to Exclude Testimony of Defendants'
Putative Certified Industrial Hygienist John Spencer**

The plaintiffs are moving to exclude the testimony of John Spencer because his opinion that Mr. Sanderson was not exposed to dangerous amounts of benzene while working at as a mechanic or gas station attendant is not supported by the facts in this case is not an opinion requiring expert testimony under the Rules of Evidence, and has not been accepted by the scientific and medical community and is not the "product of reliable and scientific principles and methods." *Daubert*[1] and Rule 702 of the Federal Rules of Evidence require that the opinion be generally accepted in the scientific community and among other things, be the product of reliable methods.[2] Mr. Spencer's opinions have no reliable basis, the facts he uses to justify his conclusions are not supported by documents or the sworn testimony in this case. Mr. Spencer's opinions either disregard or misconstrue the sworn testimony of several witnesses.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[2] This Court has issued several decisions addressing *Daubert* challenges to witnesses. See *generally Gustings v. Travelers & Standard Fire Ins. Co.*, No. Civ. A 07-4443, 2008 WL 4948837 (E.D. La. Nov. 18, 2008) (Engelhardt, J.) (discussing *Daubert* requirements); *Wyeth v. Rowan Companies, Inc.*, No. Civ. A 07-2823, 2008 WL 3975625 (E.D. La. Aug. 26, 2008) (Engelhardt, J.) (same); *Wilson v. Thompson/Center Arms Co., Inc.*, No. Civ. A 05-6493, 2007 WL 4727639 (E.D. La. Nov. 1, 2007) (Engelhardt, J.) (same); *NREC Power Systems, Inc. v. Miba Bearings U.S. L.L.C.*, No. Civ. A 05-4205, 2007 WL 2264756 (E.D. La. Aug. 2, 2007) (Engelhardt, J.). *See also U.S. v. Bennett*, No. 06-41233, 258 Fed.Appx. 671 (5th Cir. Dec. 13, 2007) (not designated for publication) (discussing *Daubert* requirements), *cert. denied*, --- U.S. ---, 128 S.Ct. 2904, 171 L.Ed.2d 844 (2008).

## I.     BACKGROUND

The plaintiff, Richard Sanderson, worked as mechanic and gas station attendant from 1961 through 1978 at two Shell gas stations. While working as a mechanic and gas station attendant he was regularly exposed to benzene and benzene containing products including, pure benzene and other benzene containing products.  In 2010, Mr. Sanderson was diagnosed with myelodysplastic syndrome, a disease of the bone marrow and blood.

## II.    LAW AND ARGUMENT

### A.     John Spencer and his attorneys have misrepresented his involvement in the *Lane v. Gasket Holdings, Inc. Case.*

In Mr. Spencer's declaration he asserts:   "The statements that I was excluded from testifying in the case *of Lane v. Gasket Holdings, Inc*. Is a total fabrication by the plaintiff.  In fact, I have never worked on a case by that name."[1] Mr. Spencer's statement is untrue, unless there are two Industrial Hygienists named John Spencer who worked for the United States Coast guard form 1982 through 1987 Mr. Spencer worked on the *Lane v. Gasket Holdings* matter.[2]  in *Lane v. Gasket Holdings* the court held:

> Gasket Holdings designated John Spencer as an expert industrial hygienist to testify about practices and operations with asbestos-containing products during his tenure in the United States Coast Guard between 1982 and 1987, where he was in charge of asbestos abatement operations on Naval destroyers. The court excluded that portion of Spencer's testimony about asbestos levels detected when removing pipe covering on the ground Spencer's experience was on a different class of destroyer than the one aboard which Lane served; there had been no showing the pipe covering was the same on Spencer's ships as on the Holder; and no showing that any pipe covering had been removed on the Holder. This ruling was not in error.

---

[1] Shell's Memorandum in Opposition to Plaintiffs' Motion to Exclude Testimony of John Spencer, Exhibit A [rec. 45-1]
[2] See *Lane v. Gasket Holdings, Inc*., (Cal. App. 2003.), *Exhibit 1 (attached)*

> Spencer was not qualified to testify about the products used *on the Holder*, nor about details of Lane's exposure to other companies' asbestos products as described in *Sparks v. Owens-Illinois, Inc*., *supra*, 32 Cal.App.4th at page 478. Spencer had never been on the Holder, and had no experience with Lane's exposure, or with how the Holder was maintained. Spencer was not even competent to testify about the Holder's entire class of naval destroyers.
>
> Gasket Holdings' assertion is unavailing that it is irrelevant that Spencer's experiences were aboard a different class of ship than the Holder, where at issue is the product used on the ships. Spencer had no experience with the U.S.S. Holder and thus could not connect other makes of asbestos products with Lane or his ship. (*Sparks v. Owens-Illinois, Inc*., *supra*, 32 Cal.App.4th at p. 478.)[3]

The *Lane* Court decision is attached as Exhibit 1.  Not only was Mr. Spencer incorrect when he claimed he was excluded from testifying, Mr. Spencer's statement that he never worked on the mater is the "total fabrication".  Such a statement surely raises issues of the veracity of his other statements and assertions.

Additionally, Mr. Spencer's testimony was excluded in *Lavender v. Bayer Corp*., No. 93-C-226K (Circuit Court of Marshall Co., WV).  The court found his methodology flawed because he attempted to utilize benzene exposure data from Bayer works to establish Plaintiff's exposure, without determining whether or not the Bayer works and the Plaintiff was in the same "exposure zone".   He failed to demonstrate that the exposure rates he applied were an appropriate "fit".

Similarly, in  the case at bar, Mr. Spencer frails to include information regarding how the exposure rates he has chosen for Mr. Sanders "fit" Mr. Sanderson's working conditions.

## A.    Mr. Spencer's opinions are based on incomplete and inaccurate information

The Federal Rules of Evidence provide that an expert witness may testify if: "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence

---

[3] See *Lane v. Gasket Holdings, Inc*., (Cal. App. 2003.), *Exhibit 1 (attached)*

or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.[3]

In Mr. Spencer's report, he bases his opinions on the supposed facts remaining after he has disregarded Mr. Sanderson's testimony. He further misconstrues the information provided by Mr. Veranth and Mr. Stathes.  [4]

Mr. Spencer allegedly relied upon interviews with Frank Veranth, Herb Stathes.   In reality, it appears Mr. Spencer came to the conclusion he wanted regarding Mr. Sanderson's benzene usage without any supporting evidence.

In Mr.  Stathes deposition he admitted that he did not have any knowledge of whether River Parish Oil Co., a Shell product reseller, purchased benzene in bulk:

22

```
 7  Can you tell me if you have any
 8  knowledge whether or not River Parish Oil
 9  Company would purchase benzene in bulk
10  quantity?
11     A.  No.
12     Q.  Do you have knowledge or you don't
13  know?
14     A.  I don't know.[4]
```

Stathes further acknowledged that River Parishes Oil Co. was a Shell re-seller (a/k/a jobber or distributor) and that they have purchased and re-sold Shell lubricants, fuels and solvents since 1955.[5] Mr. Stathes further acknowledged that River Parishes sold Shell products in five (5) gallon and 55 gallon containers[6]:

19

---

[3] Fed. Rules of Evidence, Rule 701.
[4]  Spencer's Original Expert Report. A copy of this report is attached as Exhibit A to Plaintiffs Motion to Exclude Testimony of Defendants Putative Certified Industrial Hygienist [Rec. 37]
[4] Deposition Herbert Stathes (9/13/2010) at 22:7-22:13 (Exhibit 2)
[5] *Id.* at 17:10-14
[6] Id at 19-22

4   Does it indicate that River Parish
5   sold products in five-gallon containers and
6   55-gallon containers?
7       A.  It did, uh-huh (indicating
8   affirmatively).

                         20
21  THE WITNESS:
22       Yes.  They sold 55-gallon drums
23  and five-gallon drums or pails of lubricants
24  and compounds.
25  EXAMINATION BY MR. WILLIAMS:

                         21
1       Q.  Would that be the same for
2   solvents as it states on the first page,
3   sir?  Back to the first page.
4       MR. DILLE:
5       I will stipulate that it says what
6   it says.
7       THE WITNESS:
8       I don't have my glasses.  Yes.[7]

Mr. Stathes admitted that he did not know if River Parishes Oil purchased and re-sold Shell benzene or toluene, that was outside the scope of his job.[8] Mr. Stathes also admitted that Shell had 55- gallon drums and 5 gallon buckets for products. [9]

Frank Veranth, who worked for Shell Chemical Company, stated that he had no connection with Shell Oil and would not know if Shell Oil had sold benzene to jobbers or re-sellers.[10] He further stated that he would have no idea where a Shell gas station owner would have purchased motor oil and other products form the 1960's to 1970's, that it would not have been through his division. [11]   Neither Mr. Veranth or Mr. Stathes offered testimony that

---

[7] *Id.*
[8] *Id.* at 25-27
[9] *Id* at 34
[10] Deposition Frank Veranth (9/13/2010) at 10-11; 13 (Exhibit 3)
[11] Deposition of Frank Veranth (9/13/2010) at 12, 17

contradicts Mr. Sanderson's testimony.

Mr. Spencer seems to have asked question of individuals who did not and would not have the knowledge of Shell's distribution of products to gas stations, and then assumed their lack of knowledge as confirmation of his own pre-formed opinion. It is unclear whether Mr. Spencer spoke with Mr. Veranth.   In fact, Mr. Veranth had no recollection of speaking with Mr. Spencer.[12]

---

[12] *Id* at 18.

**B. Mr. Spencer is not qualified to testify to the legal threshold of "sophisticated user" as established under Louisiana tort law and product liability law.**

Mr. Spencer confuses the determination of the legal threshold "sophisticated user", with the legal duties under OSHA.  The term 'sophisticated user" is a term of art used in evaluating a users knowledge, and expected knowledge in light of their own actions.[13]   In addition, product liability laws impose standards of care upon manufactures which are legal standard beyond the scope of any experience Mr. Spencer has in interpreting OSHA rules.  Mr. Spencer fails to grasp that there is a difference between the legal duties imposed by statutes such as OSHA, and the duties imposed under tort and product liability statutes. He is not an expertise on the legal consequences of tort and product liability laws – and it is inappropriate for him to testify to matters in which he is not qualified.

**C.     Mr. Spencer's conclusions are flawed and based on inconsistent or lacking evidence**

Dr. Nicas  had the following comments regarding Mr. Spencer testimony:

- "Mr. Spencer did not say that my methods for estimating benzene vapor inhalation exposure levels were incorrect. Rather, he disputed my assumption (based on Mr. Sanderson's sworn testimony) that Shell benzene was mixed with mineral spirits and used as a parts washer solvent.
- In rejecting the plaintiff's claim about Mr. Sanderson's use of Shell benzene, Mr. Spencer did so without any first-hand knowledge of Mr. Sanderson's use of chemical products. Instead, he relied on conversations he had with three Shell employees. To my knowledge, at the time Mr. Spencer wrote his report, none of the three Shell employees had provided sworn testimony in this case. In addition, I have seen no notes of Mr. Spencer's conversations with these employees. Mr. Spencer said that according to these Shell employees: (i) Shell did not sell "benzene" to service stations; (ii) in the 1960's and 1970's, Shell sold benzene "in tank truck and barge load quantities to chemical companies"; (iii) Shell did not have a retail facility on River Road in New Orleans; and (iv) Shell never sold 5-

---

[13] *Weber v. Fidelity & Casualty Insurance Co*. 259 La. 599, 250 So.2d 754 (La 1971); *Bell v. Jet Wheel Blast,* 462 so. 2d 166 (la. 1985); *Horne, Jr. v. Liberty Furniture Co.* ,452 So. 2d 204 (La.App. 5 Cir. (5/18/1984); *Warren v. Sabine Towing and Transp. Co., Inc*. 831 So.2d 517, 529, 2001-0573 (La.App. 3 Cir.,2002)

gallon containers of benzene. Mr. Spencer did not say that any of the three employees either worked at the Shell bulk plant on River Road or was intimately familiar with the sales practices of that bulk plant."[14]

Neither Frank Veranth nor Herb Stathes had knowledge of the Shell Bulk Plant, or what products it supplied.[15] Nor are Mr. Spencer's conclusions consistent with the actual sworn testimony of Mr. Veranth, Mr. Stathes, or Mr. Sanderson. As a result, it is unclear how Mr. Spencer could completely disregard Mr. Sanderson's testimony, when he had no conflicting statements or testimony to dispute it.

Dr. Nicas further opined that "Mr. Spencer seemed to admit that the bulk plant did, in fact, sell benzene."[16] Mr. Spencer provided no evidence or testimony refuting that Shell sold benzene in 55-gallon drums either through the Shell bulk plant or thorough River Parishes Oil.[17] Dr. Nicas further states:

- Mr. Spencer did not dispute my estimates of Mr. Sanderson's benzene exposure while filling vehicles with Shell gasoline. Specifically, he did not dispute my assumptions that: (i) the average benzene vapor exposure level while pumping gasoline was 0.955 ppm, and (ii) the fill rate was 10 gallons per minute. Using these assumptions, Mr. Spencer estimated that if Mr. Sanderson pumped gasoline for 30 minutes in an. 8-hour work day, his 8-hour TWA benzene inhalation exposure due to the gasoline alone was 0.06 ppm. However, Mr. Spencer ignored the circumstance that when Mr. Sanderson ran his own Shell service station, he pumped 1,000 gallons of gasoline per day, on average, and that during the gasoline crisis of 1974, he pumped 2,000 to 3,000 gallons per day. According to Mr. Spencer's estimation method, on days Mr. Sanderson pumped 1,000 gallons of gasoline, his 8-hour TWA benzene inhalation exposure due to the gasoline alone was 0.2 ppm, and on days Mr. Sanderson pumped 3,000 gallons of gasoline, his 8-hour TWA benzene inhalation exposure due to the gasoline alone was 0.6 ppm. Because Mr. Spencer is concerned with comparing Mr. Sanderson's benzene inhalation exposure levels to federal OSHA benzene standards, I note that 0.6 ppm exceeds the OSHA action level of 0.5 ppm as an 8-hour TWA value.

---

[14] Dr. Mark Nicas, "Comments on Mr. Spencer's Report in the Richard Sanderson Case", Exhibit 3 (attached)
[15] Deposition Veranth at 10;  Deposition Stathes at 15
[16] Dr. Mark Nicas, "Comments on Mr. Spencer's Report in the Richard Sanderson Case", Exhibit 3 (attached)
[17] Dr. Mark Nicas, "Comments on Mr. Spencer's Report in the Richard Sanderson Case", Exhibit 3 (attached)

> In Figure 1 in Mr. Spencer's report, the only listed "relevant occupational exposure limits" are the original OSHA PEL of 10 ppm as an 8-hr TWA, and a 1982 ACGIH TLV of 25 ppm. Mr. Spencer forgot to mention that the current NIOSH recommended exposure <u>limit</u> is 0.1 ppm as a 10-hour TWA, and that the current ACGIH 8-hour TWA-TLV is 0.5 ppm.[18]

Dr. Nicas points out that Mr. Spencer's statement that Dr. Nicas "failed to take into account ... the likelihood that the plaintiff actually used the chemical `benzene' as described." is a curious statement. Dr. Nicas based his exposure calculations on Mr. Sanderson's sworn testimony that he used benzene in the manner he described. It is appears to be Mr. Spencer who failed to account for Mr. Sanderson's use of Shell benzene as described.

Dr. Nicas further explains:

> Mr. Spencer said: "Quantitative dermal exposure assessment is not standard practice for industrial hygienists." If Mr. Spencer contends that the method I used is not accepted in the industrial hygiene profession as a way to retrospectively estimate dermal absorption of benzene, he is wrong. In my report in this case, I cited documents/articles starting from 1992 (including one from the U.S. EPA) that use the dermal absorption estimation method that I employed. In addition, the Third Edition of "A Strategy for Assessing and Managing Occupational Exposures" (copyright 2006), written by members of the AIHA Exposure Assessment Strategies Committee, contains an appendix by Sahmel and Boeniger which offers the same method that I used. That Mr. Spencer personally might not accept the method would simply demonstrate that he is outside the mainstream of the profession. I note that Mr. Spencer's statement appears to contradict his sworn deposition testimony on July 1,2009, in the case of Jo Ann Bishop et al., versus Shell Oil Company, et al., Case No. 07-2832, U.S. District Court for the Eastern District of Louisiana. In his July 2009 deposition, Mr. Spencer referred to the Paustenbach equation (from the 1992 paper) as a "standardized formula". Page 35 of my copy of the transcript reports the following exchange:
>> Q. Do you disagree with his [Dr. Paustenbach's] formula for dermal calculations. A. Oh no; it's a standardized formula. There's -- there's certainly no problem with that.
>> Q. Do you agree that Dr. Paustenbach himself has used that formula to create dermal calculations for benzene exposure?
>> A. Oh sure, a lot of people have calculated -- calculated dermal exposures, sure, using that standardized formula."

---

[18] *Id.*

On page 15 of my copy of the transcript, Mr. Spencer also referred to the AIHA manual "A Strategy for Assessing and Managing Occupational Exposures" as containing "a standardized practice" for conducting an exposure assessment.

Mr. Spencer states: "There is no dermal exposure limit. OSHA, ACGIH and NIOSH neither require nor recommend quantifying dermal exposures." This is a distortion OSHA, NIOSH and ACGIH positions.

The OSHA standards DO NOT allow dermal exposures;  under OSHA dermal contact with benzene is  non-compliance with its benzene standard.[19] According to Dr. Nicas: "If an OSHA inspector were to observe dermal contact with a solution containing 80% benzene, a citation would be warranted. The inspector would not bother to calculate a dermally absorbed dose, because such a calculation would not be necessary to support the citation. Because OSHA prohibits dermal contact with benzene, the de facto OSHA benzene dermal exposure limit is zero."[20]

Similarly, the NIOSH guideline for benzene also states that chemical protective clothing should be work to prevent skin contact.  "Therefore, the NIOSH recommended benzene dermal exposure limit is also zero. Dr. Nicas explains " Because OSHA requires, and NIOSH recommends. preventing dermal contact with benzene, it would be non-sensical for these agencies to simultaneously recommend that the dermally absorbed benzene dose be quantified."[21]

---

[19] Appendix A, paragraph III.B., 29 CFR 1910.1028, states: "You must wear appropriate protective clothing (such as boots, gloves, sleeves, aprons, etc.) over any parts of your body that could be exposed to liquid benzene." This statement applies to benzene-containing liquids, because paragraph 1910.1028(b), Definitions, states: "It [benzene] includes benzene contained in liquid mixtures and the benzene vapors released by these liquids." This requirement applies without regard to the benzene-in-air exposure level.
[20] Dr. Mark Nicas, "Comments on Mr. Spencer's Report in the Richard Sanderson Case", Exhibit 3 (attached)
[21] *Id*.

Finally, Dr. Nicas raised a third point with respect to dermal exposure limits:

…with regard to the ACGIH TLV, which is a guideline, Mr. Spencer failed to mention that a "Skin" notation is attached to the benzene TLV. The ACGIH offers the following explanation of the Skin notation:

"The designation of `Skin' in the `Notations' column refers to the potential significant contribution to the overall exposure by the cutaneous route, including mucous membrane and the eyes, either by contact with vapors or, of probable greater significance, by direct contact with the substance ... Use of the skin notation is intended to alert the reader that air sampling alone is insufficient to quantitate exposure accurately and that measures to prevent significant cutaneous absorption may be required."

In essence, the ACGIH says that when dermal absorption is occurring, estimating inhalation absorption via air sampling fails to accurately quantify the total chemical mass absorbed. The ACGIH also states that measures to prevent dermal absorption may be required if significant absorption is occurring. Because one cannot judge whether the amount of dermal absorption is "significant" unless one quantifies that absorption, the ACGIH text implicitly recommends quantifying dermal absorption, with the exception that one may choose to *assume* that dermal absorption is significant and eliminate all dermal exposure by suitable protective equipment and/or a process change.[22]

For these reasons, Mr. Spencer's decision to ignore Mr. Sanderson's dermal exposure is without justification, and in defiance of the accepted standards.  Mr. Spencer has added additionally argument that he did not model dermal exposure because that would normally be "determined by the collection of biological samples, blood or urine samples"[23]  Of course, he fails to state how to determine the dermal dose where the exposure occurred years ago and blood and urine samples would be of no use.  This seems to raise the philosophical question "If a tree falls in the forest, and no one is there to hear it, does it make a sound?" Mr. Spencer would clearly say "No:, However we are dealing with science, no philosophy, and Mr. Spencer presumption that if there

---

[22] *Id.*
[23]  Memorandum in Opposition to Plaintiffs' Motion to Exclude Testimony of John Spencer , p 13

are no blood urine samples available, there must be no exposure is not a valid scientific methodology.

## Conclusion

Spencer's opinions are inconsistent with the sworn testimony offered in this case.  For these reasons stated above and in **Plaintiffs' Motion to Exclude Testimony of Defendants' Putative Certified Industrial Hygienist John Spencer** the plaintiffs respectfully request the court to exclude or limit Mr. Spencer's testimony.

RESPECTFULLY SUBMITTED:
*s/ Amber E. Cisney*
Richard J. Fernandez, LA Bar # 05532
Amber E. Cisney, LA Bar # 28821
**RICHARD J. FERNANDEZ, LLC**
3000 West Esplanade Ave., Ste. 200
Metairie, Louisiana 70002
Telephone:(504) 834-8500
Facsimile:(504) 834-1511
rick@rjfernandezlaw.com

and

L. ERIC WILLIAMS, JR. # 26773
**WILLIAMS LAW OFFICE, LLC**
3000 W. Esplanade Ave., Ste. 200
Metairie, Louisiana 70002
Telephone:(504) 832-9898
 Facsimile: (504) 834-1511
eric@amlbenzene.net

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing pleading has been served upon all known counsel of record, via electronic filing on this 18th day of September, 2010.

s/ Amber E. Cisney
Amber E. Cisney